FILED

SEP 2 2 2020

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARA ANN K.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>　　　　　Defendant. | Case No.: 3:19-cv-01099-BEN-NLS<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF CLARA ANN KELLEY'S MOTION FOR SUMMARY JUDGMENT; and**<br><br>**(2) GRANTING DEFENDANT ANDREW SAUL'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 11, 12]** |

## I.   INTRODUCTION

Plaintiff Clara Ann K.[1] ("Plaintiff") brings this action under the Social Security Act, 42 U.S.C. § 405(g), and seeks judicial review of the final decision denying her claim for disability insurance benefits by Defendant Andrew Saul, Commissioner of Social Security ("Defendant"). ECF No. 1. Before the Court are Plaintiff's Motion for Summary Judgment

---

[1]　In accordance with S.D. Cal. Civ. R. 7.1(e)(6)(b), which provides that "[o]pinions by the court in these [Social Security cases] will refer to any non-government parties by using only their first name and last initial," the Court has redacted Plaintiff's last name and requests that the parties do so as well in any future filings.

(the "Motion"), ECF No. 11, and Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment of (the "Cross-Motion"), ECF No. 12. Defendant opposed Plaintiff's Motion. ECF No. 12. Plaintiff replied. ECF No. 13. The motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1). After considering the papers submitted, administrative record, and applicable law, the Court **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 11, and **GRANTS** Defendant's Cross-Motion for Summary Judgment, ECF No. 12.

## II.   BACKGROUND

On June 4, 2015[2], Plaintiff filed a Title II application for Social Security Disability Insurance, alleging a disability onset date of October 30, 2012[3]. AR 154-55. Plaintiff's disability allegations arose out of "neurocognitive problems resulting from a 2009 car accident," superimposed on pre-existing cognitive limitations. ECF No. 11 at 2:19-23. On June 12, 2019, Plaintiff timely commenced this action in federal court seeking judicial

---

[2]   While the Complaint, ECF No. 1, Plaintiff's Motion, ECF No. 11 at 2:4, Defendant's Cross-Motion, ECF No. 12-1 at 2:2-3, and the May 23, 2018 decision of the Administrative Law Judge (the "ALJ"), Administrative Record, ECF No. 8 ("AR") at 15, all refer to Plaintiff filing for disability on February 19, 2015, the Court notes that Plaintiff's Application Summary for Disability Insurance Benefits has a date of June 4, 2015, AR 154. That being said, this discrepancy does not appear to impact the outcome of Plaintiff's Motion in any regard.

[3]   While Plaintiff stated on her Application Summary for Disability Insurance Benefits that she became unable to work because of a disabling condition on October 30, 2012, when Plaintiff was 58 years old, *see* AR 154-55, a June 4, 2015 Field Office Disability Report, Form SSA-3367 EDCS, lists Plaintiff's alleged onset date as February 1, 2010, *see* AR at 196 (stating "Claimant's Alleged Onset Date: 02/01/2010), "when she was days short of being age 56," AR at 252. As discussed in further detail below, the relevant adjudicatory period for determining social security benefits is the period after the alleged onset and before the date last insured. *Accord Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008); *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998). Because using the alleged onset date of October 30, 2012 would mean no records would fall within the relevant adjudicatory period as the alleged onset date (October 30, 2012) would arise after the date last insured (June 30, 2012), the Court defers to the ALJ's decision using an alleged onset date of February 1, 2010 rather than the October 30, 2012 date provided by Plaintiff in her Application.

review of the August 24, 2015 denial, November 20, 2015 denial on reconsideration, May 31, 2018 decision after a hearing before an Administrative Law Judge ("ALJ"), and April 15, 2019 Appeals Council decision, all denying Plaintiff's right to social security insurance benefits. AR 1-3, 15, 23, 29, 72-93, and 152-53[4]; *see also* ECF No. 1.

### A.   Statement of Facts

Plaintiff was born on February 17, 1954 and is currently 66 years old. AR 80. Plaintiff has four or more years of college, AR 201, as well as a master's degree in marketing, ECF No. 11 at 2; AR 324. Plaintiff held several jobs concurrently in different fields since 2000. AR 200.

From 1978 until 2012, Plaintiff worked as a licensed commercial real estate agent. AR 44; *see also* AR 201. Concurrently, from January 2000 to January 2006, she also owned a business that sold and licensed software games. AR 201. From June 2006 to November 2012, she owned a photography lab business, named "Photo Works." AR 42. Plaintiff refers to Photo Works as an investment that she did not actively manage. *Id.* From June 2009 to January 2010, Plaintiff worked as an industrial leasing agent. AR 46; AR 201. From 2011 to sometime in 2015,[5] Plaintiff worked as a self-employed photographer. AR 201. Plaintiff testified that her last job involved photo restoration and taking photos of individuals. AR 57–58.

On June 27, 2007, when Plaintiff was 53 years old, working as a real estate agent, and owned Photo Works, Plaintiff was involved in a bicycle accident. AR 328. Plaintiff underestimated the size of a curve in front of her, causing her tire to hit the curb and throwing her forward over the handlebars. *Id.* Plaintiff had been wearing a helmet at the

---

[4]   For clarity, all references to pages in the AR are to the bold number on the bottom right-hand corner of ECF No. 8 rather than the ECF page number at the top of the pages.

[5]   In Exhibit 3E – Disability Report from Claimant, when asked to list recent job history and the dates worked, Plaintiff indicated she worked as a self-employed photographer from 2011 to "PRESENT." AR 200. According to the Court transcript Index, Exhibit 3E was dated June 4, 2015. Thus, the Court references 2015 as the date of last employment for Plaintiff's photography job.

-3-

time of the accident and did not experience loss of consciousness. *Id.* A computerized tomography ("CT") scan of the face showed soft tissue swelling but no fractures; however, she was diagnosed with a closed radial head fracture on the left that was displaced an occult scaphoid fracture. *Id.* Plaintiff later advised her physicians that "she eventually totally recovered from this problem." *Id.*

On July 11, 2009, while Plaintiff was working as a real estate and leasing agent, a driver rear-ended Plaintiff while she was driving on the freeway, resulting in roll-over car accident, which resulted in Plaintiff being taken to Sharp Memorial Hospital. AR 267-68. The following day, July 12, 2009, the hospital discharged Plaintiff. *Id.*

In her Disability Report, Plaintiff claims the following physical or mental conditions: "traumatic brain injury, cognitive deficits, impa[i]red memory, problem with multi-tasking, problem finding correct word, get confused, imp[]aired recall, [and] problems with concentration." AR 200. When the ALJ asked Plaintiff why she could no longer work, Plaintiff indicated that she could no longer work because of her forgetful memory. AR 50. To this end, Plaintiff testified she can count up to "three or four, maybe five," then she will have to ask for help. AR 49–50. Plaintiff also testified that her poor memory sometimes manifested when involved in simple tasks, such as heating water. *See id.*

### 1. *Documentary Medical Evidence*

Because Plaintiff's only dispute involves the ALJ's characterization of her cognitive ability, the Court only summarizes medical information relevant to this point.

In 1996, while attending Washington State University, Plaintiff was tested for auditory processing deficiencies. AR 387-99. A speech-language pathologist administered several tests and concluded the tests did not suggest auditory processing disorder but suggested a difficulty synthesizing speech sounds. AR 390. Further testing was recommended. *Id.*

As discussed above, Plaintiff experienced two head-related trauma events related to her alleged disability. The first event involved a bicycle accident in June of 2007, during which Plaintiff had been wearing a helmet and did not lose consciousness. AR 328. The

-4-

second event was a car accident on or about July 11, 2009. AR 266. As Plaintiff recounts, she was driving on the Interstate 15 when another vehicle bumped into the rear of her vehicle. AR 40. The bump caused her car to spin out-of-control and roll several times, ultimately landing on its roof. *Id*; *see also* AR 248–49 (showing images of the car after the crash). A post-crash emergency report indicated Plaintiff suffered multiple abrasions and pain in her neck, right shoulder, and right hand. AR 266–68.

On July 22, 2009, eleven days after the car accident, Abraham S.C. Chyung, M.D. met with Plaintiff regarding Plaintiff's concerns about memory issues stemming from the accident. AR 419. Dr. Chyung's report indicated Plaintiff reported that she (1) "has been having persisting memory difficulty following the incident," (2) "is forgetful and frequently misplaces items," (3) "has trouble coming up with words during conversations," and (4) "is becoming very much dependent on her daily planner to keep track of her activities." *Id*. "[D]espite her complaints, the patient reports that she is still able to perform her work duties at a satisfactory level." *Id*. Upon examination, Dr. Chyung noted "[t]he patient does appear to have some mild degree of word-finding difficulty when she speaks," aligning with Plaintiff's complaints to him. AR 420. Dr. Chyung also reviewed the July 11, 2009 CT scan and reported it as "unremarkable," but suspected Plaintiff may be suffering from postconcussion syndrome. *Id*.

On September 02, 2009, Plaintiff visited Dr. Chyung for a follow-up appointment. AR 416. Plaintiff represented that "her overall condition is improving with time, but that she is not yet back to her baseline." AR 416. Dr. Chyung again noted that Plaintiff had mild word-finding difficulty and suggested further diagnostic testing. AR 417.

On November 13, 2009, Plaintiff next saw Dr. Chyung, and his progress notes indicate similar word-finding difficulty. AR 411. According to Dr. Chyung, because Plaintiff continued to report memory difficulty, "questions are raised with regard to the underlying nature of her cognitive difficulty." AR 412. "To clarify matters in that regard, she was advised to proceed with formal neuropsychological testing." *Id*.

On June 14 and 15, 2010, Michael H. Kabat, M.D. conducted a neuropsychological

examination of Plaintiff.[6]  AR 351-60.  Dr. Kabat's examination revealed the following:

> Exam results were significant for impairment in aspects of temporal orientation, sustained attention, phonemic oral word production, and confrontation naming. Inconsistencies (within normal limits and below expectations performance within a single domain of functioning) were noted in focused/flexible attention, working memory acquisition of new information, and aural comprehension . . . . Overall, the examination results are not consistent with a neurodegenerative disorder at this time . . . . This case was complicated by the number of factors that are potentially contributing to the patient's neurocognitive functional status. Specifically, the patient reported a history of pervasive attention/concentration problems, a verbal learning disorder impacting the process of consonants as well as the comprehension of phonics, pervasive reading difficulties, an injury secondary to a fall from her bicycle in 2008, and injury secondary to a motor vehicle accident in 2009.  The profile of results does not appear to be an exact match with any of the potential contributing variables.   The neurocognitive profile obtained during this examination contained elements that are somewhat congruent with the expected presentation of an untreated pervasive attention disorder.  However, the profile is not an exact fit with this factor.  As such, this variable was considered contributory and not sufficient to entirely explain the patient's neurocognitive findings . . . . Given [Plaintiff's] history, the profile of results, limitations in the availability of salient formal medical records, and following baseline examination, the most appropriate diagnostic determination at the present time is Cognitive Disorder NOS.  The precise mechanism for the latter remains unclear.   Specifically, her current presentation and profile is not an exact fit with any one of the potential salient factors.   Furthermore, there was an absence of pertinent information that is essential in an effort to parse out the potential contribution of preexistent variables.  While it is possible that a combination of the variables discussed above is responsible for

---

[6]  The examination tested: temporal orientation, general intellectual functioning, attention/concentration, acquisition and memory, language functioning, visual processing/reproduction/construction, aspects of executive functioning, processing speed, aspects of motor functioning, and psychiatric considerations.  AR 354-57.

her current neurocognitive profile, further investigation via interval examination is imperative in an effort to further refine the diagnostic conclusions.

AR 357–60. Dr. Kabat recommended that Plaintiff attend cognitive remediation as a necessary tool for compensating with Plaintiff's difficulties. AR 360. Plaintiff attended two cognitive remediations with Dr. Kabat. AR 347. During the first session, Dr. Kabat stated that Plaintiff "demonstrated anxiety with a restricted range of affect during the session" and pressured speech was evident. *Id.* Dr. Kabat also reported similar results during the second session. *See id.*

On August 1, 2012, almost two years later, Michael A. Lobatz, M.D. performed an independent medical evaluation ("IME") on Plaintiff. AR 323-30. Dr. Lobatz did not have all of Plaintiff's medical records before him, but nonetheless, believed there to be a possibility of an enduring post-concussive syndrome. AR 329. On May 5, 2013, Dr. Lobatz prepared a supplemental report after receiving additional records. AR 331-32. In this report, Dr. Lobatz found "the preponderance of evidence in [Plaintiff's] case to support a diagnosis of mild traumatic brain injury with persistent cognitive complaints." AR 334.

On June 21, 2013, Plaintiff, whose last neurology visit with Dr. Chyung had not been since July 8, 2010, visited Dr. Chyung with a chief complaint of hallucinations. AR 425. Plaintiff's hallucinations involved "visions of people with her eyes closed."[7] *Id.* On August 27, 2013, after Dr. Chyung's referral, Saeed Yadegar, M.D. conducted an MRI of Plaintiff's brain. AR 424. Dr. Yadegar concluded the exam was "[u]nremarkable except for a few punctate nonspecific areas of abnormal signal within the white matter of the left frontal and left parietal region." *Id.*

On September 04, 2013, after the MRI of her brain, Plaintiff followed up with Dr.

---

[7]    Regarding the hallucinations, Plaintiff also visited Dr. Ha Bich Mistry. AR 342. Plaintiff reported the same hallucinations to Dr. Mistry as she did to Dr. Chyung, *Compare* AR 425, *with* AR 342. Dr. Mistry diagnosed Plaintiff with anxiety. AR 343.

Chyung.  AR 407.  Dr. Chyung reviewed the MRI with Plaintiff, and according to Dr. Chyung, Plaintiff responded poorly to being advised that the MRI was negative for significant abnormality:

> Recently completed brain MRI scan result was reviewed with the patient.  She became upset by the absence of significant abnormality despite her history of head trauma.  The scan did find mild degree of white matter changes consistent with small vessel disease.  She insisted that the report be modified to claim that these white matter changes are the consequence of the head trauma history and that it is the underlying cause of her symptoms.  Unfortunately, it is not possible to comply with that request.  It is more likely that the documented signal anomalies are indeed reflective of future stroke risk.  On the other hand, posttraumatic changes from the car accident must be subtle and below the threshold of detection by magnetic resonance.

AR 207.

Dr. Chyung tried to offer his assistance to Plaintiff by discussing stroke prevention measures with her, but he noted that Plaintiff became "visibly upset and tearful due to the 'disappointing' MRI result," and instead, "elected not to continue her medical evaluation." AR 207.

On February 03, 2014, Plaintiff returned to Dr. Lobatz for a consultation after last being seen by Dr. Lobatz in 2013 for the IME regarding her mild traumatic brain injury. AR 313.  Dr. Lobatz referred Plaintiff for cognitive remediation due to her continuing issues and ordered an electroencephalogram due to Plaintiff's visual complaints. AR 315.

In the interim, however, on June 6, 2014, Jessica Hague, MCD, CCC-SLP, performed a speech pathology evaluation. AR 370.  This evaluation found mild cognitive-linguistic deficits complicated by short-term memory loss, decreased processing speed for complex verbal information (lengthy or new instructions), and decreased working memory for "4+ units." AR 370.  Results from Woodcock-Johnson III tests of Cognitive Abilities "indicated mild impairments for working memory, visual-auditory learning, numbers reversed, and delayed recall. *Id.*

On March 28, 2015, Glenn H. Tsukada, M.D. performed the MRI Dr. Lobatz had

requested.    AR 303–05.    Dr. Tsukada concluded that Plaintiff demonstrated (1) "[a]bnormal diffusion tensor imaging in the corpus callosum suggestive of loss in microstructural white matter integrity . . . likely . . . secondary to previous trauma if there were no neurological abnormalities prior to the traumatic event"; (2) "[b]orderline abnormal MR spectroscopy of the right frontal white matter"; and (3) "[i]ncidental significant asymmetry of the amygdala of uncertain significance or etiology and may merely represent a normal variant." AR 304. On May 19, 2015, Dr. Lobatz reviewed the MRI and concluded that his opinions "remain unchanged" and were "reinforced by MRI findings." AR 319.

Shortly thereafter, on June 2, 2015, Dr. Lobatz performed a mental residual functional capacity assessment ("MRFC") on Plaintiff's cognitive abilities. AR 336–39. Dr. Lobatz found a medically determinable impairment and a disabling condition of "traumatic brain injury, cognitive deficits." AR 336. Dr. Lobatz described the condition as presenting "significant difficulty with multi-tasking, word-finding, recall and impaired memory." *Id.* Dr. Lobatz opined that Plaintiff had (1) "no significant limitation" on sitting, standing, walking, or lifting; (2) "difficulty with remembering tasks and chores, writing, speaking"; (3) "difficulty with concentration, cognitive tasks, [] memory deficits"; (4) "limitations [] correlated with her concentration/cognitive/memory deficits"; and (5) "difficulty with sustained attention as well as difficulty with comprehension of orally presented information." AR 336, 339. Further, "based on neuropsych [sic] testing, her memory and concentration deficits were seen with more complex tasks and delayed recall." AR 339. On the form, Dr. Lobatz check "yes" when asked if the applicant has a medically determinable physical or mental impairment that prevents the applicant form engaging in any substantial gainful activity, in any field of work." AR 336. However, Dr. Lobatz also checked the box for "Not Significantly Limited" with respect to Plaintiff's "ability to interact appropriately with the general public." AR 338.

On July 22, 2015, Dr. Lobatz provided another supplemental report which indicated that his final diagnostic impression included "[p]ersistent cognitive and memory loss

-9-

consistent with an enduring mild neurocognitive disorder." AR 361, 364.

Additionally, on June 2, 2015, Norman Zukowsky, M.D., and on November 17, 2015, Phaedra Caruso-Radin, M.D., both state agency physicians, reviewed Plaintiff's record and concluded Plaintiff's impairment was medically determinable but not disabling. *See, e.g.*, AR 78, 87 (concluding Plaintiff was"[n]ot [d]isabled," and that her "condition did not result in significant limitations in [her] . . . ability to perform basic work activities on or before June 30, 2012").

## 2. *Vocational Expert's Testimony*

Vocational Expert ("VE") John P. Kilcher testified at Plaintiff's hearing before the ALJ. AR 30, 51. Because of Plaintiff's varied employment history, he characterized Plaintiff's vocational background as the following: (1) a real estate agent at the light level and skilled, with Specific Vocational Preparation ("SVP") of 5; (2) a leasing agent at the light level and skilled, with SVP of 5, (3) a sales representative—i.e. Plaintiff's job selling and licensing software games—at the light level and skilled, with SVP of 6; and (4) photography at the light level and skilled, with SVP of 7. AR 52.

The first hypothetical posed by the ALJ was whether, assuming no exertional limitations, someone who could understand, remember, and carry out detailed but not complex instruction could do any of Plaintiff's past work. AR 59. The VE opined that Plaintiff's past jobs were all highly skilled, and thus, unsuitable for someone with Plaintiff's limitations. *Id.* The ALJ then asked if other work was available. *Id.* The VE answered that unskilled work was available and provided a list of jobs: hand packager, linen room attendant, and "markers." *Id.* Hand packager is classified at the medium level, unskilled, with SVP of 2 and an estimated 95,000 such jobs in the U.S. labor market. *Id.* Linen room attendant is classified at the medium level, unskilled, with SVP of 2 and an estimated 42,000 such jobs in the U.S. labor market. *Id.* "Markers" are classified at the medium level, unskilled, with SVP of 2 and an estimated 35,000 such jobs in the U.S. labor market. *Id.*

Then, the ALJ restricted the hypothetical to include detailed but not complex

-10-

instructions with few workplace decisions and only occasional and superficial public interaction. AR 59–60. The VE's answer did not change: the same jobs would be available. AR 60. The ALJ further restricted a new hypothetical to include only simple instructions for routine tasks and asked whether the jobs at SVP 2 would satisfy this new criterion. AR 60. The VE affirmed. *Id.* In a fourth hypothetical, restricted to just simple instructions and only occasional superficial interaction with the general public, the VE indicated the same jobs were still available. *Id.* A fifth hypothetical posed by the ALJ asked the VE to consider what jobs were available for someone who would be off task for fifteen minutes of each hour due to distractions or symptoms of impairment. *Id.* At this point, the VE stated that someone in this condition could not work because of "[t]he excessive time off task." *Id.* "Fifteen percent [time off task] would be the max allowed," and fifteen minutes off task "would be approximately 25 percent." *Id.*

The ALJ continued with another hypothetical, asking whether an individual at light exertion, needing to understand, remember, and carry out simple instructions with few workplace decisions, occasional and superficial interactions with the general public, and no requirement for a high production quota, could find a job. AR 62. The VE stated the jobs garment sorter, stock checker, and hand bander were available for this hypothetical individual. AR 62–63. Garment sorter is classified at the light level, unskilled, with SVP of 2 and an estimated 35,000 such jobs in the U.S. labor market. AR 62. Stock checker is classified at the light level, unskilled, with SVP of 2 and an estimated 31,000 such jobs in the U.S. market. AR 63. Hand bander is classified at the light level, unskilled, with an SVP of 2 and an estimated 18,000 such jobs in the U.S. labor market. *Id.*

The ALJ proceeded to allow Plaintiff's attorney to ask the VE questions. Plaintiff's attorney asked whether, "[u]sing either of your [VE's] two groups of three jobs [i.e. hand packager, linen room attendant, and markers and garment sorter, stock checker, and hand bander], if the hypothetical individual were 25 percent slower at performing that job than the other workers, is that vocationally unacceptable?" AR 64. The VE confirmed this would be unacceptable. *Id.*

In the final hypothetical, the ALJ asked whether an individual would be able to retain work if the individual missed two days of work a month—regardless of whether the missed day was the result of distractions, memory loss, or the individual forgetting he or she even has work on a given day. AR 68. The VE stated this hypothetical individual could not work. *Id.*

## B.   **Procedural History**

### 1.   ***Proceedings before the Commissioner of Social Security***

As stated, on June 4, 2015, Plaintiff filed a Title II application for Social Security Disability Insurance. AR at 154-55. On August 24, 2015, the Commissioner denied Plaintiff's claim. AR 72–93. On November 20, 2015, the Commissioner again denied the claim on reconsideration. *Id.*

### 2.   ***Proceedings before the ALJ***

On December 3, 2015, Plaintiff's requested re-hearing before the ALJ took place. AR 15, 29. Plaintiff was represented by counsel at the hearing. *Id.* Plaintiff and vocational expert John P. Kilcher testified at the hearing. AR 29–30.

On May 23, 2018, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act through June 30, 2012, the last date insured. AR 23.

On July 23, 2018, Plaintiff filed a Request for Reconsideration. AR 152-53. On April 15, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for the judicial review purposes. AR 1-3.

### 3.   ***District Court Action***

On June 12, 2019, Plaintiff filed her complaint regarding denial of benefits under the Social Security Act, initiating the present lawsuit before the Court. ECF No. 1.

After the Court granted Plaintiff's Motion for Extension of Time to File Plaintiff's Motion for Summary Judgment, ECF Nos. 9, 10, Plaintiff filed her Motion on November 22, 2019, ECF No. 11. On January 10, 2020, Defendant filed a Cross-Motion. ECF No.

-12-

12. On January 24, 2020, Plaintiff filed a reply. ECF No. 13.

## III.  STANDARDS OF REVIEW

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3). While the parties have filed cross-motions for summary judgment, the usual legal standard for summary judgment generally does not apply where the Court is asked to review the decision of an ALJ. *See, e.g., Nw. Motorcycle Ass'n v. U.S. Dept. of Agriculture,* 18 F.3d 1468, 1472 (9th Cir.1994) (noting that "[s]ummary judgment is the appropriate vehicle in the Ninth Circuit for reviewing an administrative agency's final determination"); *Ordway v. Metro. Life Ins. Co.,* 634 F. Supp. 2d 1120, 1122–23 (S.D. Cal. 2007) (stating that in the analogous case of ERISA actions, "where the plaintiff is challenging the Plan administrator's denial of benefits, 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply'"). "Thus, a summary judgment motion resting on the administrative record is not a typical summary judgment, but rather, is a procedural vehicle for determining whether benefits were properly granted or denied." *Id.*

A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards. *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla," *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995), and signifies "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019); *see also Molina v. Astrue,* 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted). It is a "highly deferential" standard of review. *Valentine v. Astrue,* 574 F.3d 685, 690 (9th Cir. 2009). However, the Court "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from

the ALJ's conclusion. *See Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted). If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Molina*, 674 F.3d at 1111. It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193. Moreover, the Court may not uphold an ALJ's decision on a ground not actually relied on by the ALJ. *Molina*, 674 F.3d at 1121. Finally, the Court may not reverse an ALJ's decision on account of an error that is harmless. *Id.* at 1111; *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (providing that "[e]ven when the ALJ commits legal error, we uphold the decision where that error is harmless," meaning that "it is inconsequential to the ultimate nondisability determination," or that, despite the legal error, "the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity").

## IV.   DISCUSSION

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months. 42 U.S.C. §§ 423(d), 1382c(a)(3). In establishing a disability claim, claimants must establish evidence not only before the last date insured but also after the alleged onset date. *Accord Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008). "Medical opinions that predate the alleged onset of disability are of limited relevance," especially "in cases such as this where disability is allegedly caused by a discrete event." *See, e.g., id* (holding that the ALJ did not err in giving little weight to medical evidence from a physician because it was provided before the alleged onset of disability at a time when the claimant "was working two jobs that he never indicated having

-14-

1   trouble performing before his on-the-job injury"). The Ninth Circuit has also held that

2   disability insurance benefits claimants have a "burden to prove disability before expiration

3   of disability insured states." *Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590

4   (9th Cir. 1998). As a result, evidence of disability arising after the last date insured also

5   lacks relevance to the determination of disability. *See, e.g., Penny v. Sullivan,* 2 F.3d 953,

6   956 (9th Cir.1993) (finding that the claimant, who suffered from degenerative disc disease,

7   needed to show disability before, rather than after, the last date insured); *see also* SSR 83-

8   20 (S.S.A. January 1, 1983). Thus, in this case, and as the ALJ noted, the relevant

9   adjudicatory period runs from Plaintiff's alleged onset date of disability, February 1, 2010,

10  through her date last insured, June 30, 2012. AR 15, 19, 154-55. However, while Plaintiff

11  argues that by considering evidence after the date of last insured, the ALJ forfeited "any

12  objection to this [Dr. Lobatz's] opinion post-dating the DLI by years," ECF No. 11 at 3:24-

13  28, that argument fails to note the ALJ's explanation for doing so. Rather, the ALJ "read

14  and considered all of the medical evidence in the record, including evidence from the

15  period prior to the claimant's alleged onset date" and after the date last insured because

16  "[t]here is no evidence to support any disabling functional limitation prior to the claimant's

17  date last insured." AR 19. In sum, the ALJ correctly noted that Plaintiff lacks evidence to

18  support a disability[8] from the relevant adjudicatory period (e.g., after the alleged onset date

19  and before the date last insured), and as a result, considered medical records from outside

20  the relevant adjudicatory period.

21       The Social Security regulations establish a five-step sequential evaluation to

22  determine whether an applicant is disabled under this standard. 20 C.F.R. §§ 404.1520(a),

23  416.920(a); *Batson*, 359 F.3d at 1194. First, the ALJ determines whether the applicant is

24  engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b). If not,

25

26  [8]    For the sake of clarity, the record contains medical records during the relevant

27  adjudicatory period (e.g., between February 1, 2010 and June 30, 2012), such as Plaintiff's
    visits to Dr. Kabat, but the ALJ did not view these records to as supporting a finding of

28  disability, and as such, considered additional records outside the relevant period.

-15-

1   at step two, the ALJ must determine whether the applicant suffers from a severe impairment

2   or a combination of impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(c). Third, if the

3   impairment is severe, the ALJ must determine whether the applicant's impairment or

4   combination of impairments meets or equals an impairment contained under 20 C.F.R. Part

5   404, Subpart P, Appendix 1. *Id.* §§ 404.1520(a)(4)(iii), 416.920(d). If the applicant's

6   impairment meets or equals a listing, he or she must be found disabled. *Id.* If the

7   impairment does not meet or equal a listing, the ALJ must determine the applicant's

8   residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e).

9   Fourth, the ALJ must determine whether the applicant retains the residual functional

10  capacity to perform past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(f). Fifth, if the

11  applicant cannot perform past relevant work, the ALJ must consider whether the applicant

12  can perform any other work that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v),

13  416.920(g).

14      The claimant carries the initial burden of proving a disability in steps one through

15  four of the analysis." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (citation

16  omitted). "However, if a claimant establishes an inability to continue her past work, the

17  burden shifts to the Commissioner in step five to show that the claimant can perform other

18  substantial gainful work." *Shaibi v. Berryhill*, 883 F.3d 1102, 1106–07 (9th Cir. 2017).

19  Applicants not disqualified at step five are eligible for disability benefits. *Celaya v. Halter*,

20  332 F.3d 1177, 1180 (9th Cir. 2003).

21      In the present case, at step one, the ALJ found Plaintiff had not engaged in substantial

22  gainful activity during the period from her alleged onset date of February 1, 2010 through

23  her date last insured of June 30, 2012. AR 17. At step two, the ALJ determined Plaintiff

24  suffered from mild neurocognitive disorder constituted severe impairments. AR 18. At

25  step two, the ALJ determined Plaintiff's history of closed head injury, status post cervical

26  strain, resolved, with sequelae of mild neurocognitive disorder constituted severe

27  impairments. At step three, the ALJ found Plaintiff did not have an impairment or

28  combination of impairments that met or medically equaled the severity of one of the listed

-16-

impairments that met or medically equaled the severity of one of the listed impairments, so the ALJ evaluated Plaintiff's RFC. AR 19. The ALJ determined she retained the RFC to perform a range of work at all exertional levels but with certain nonexertional limitations. AR 19. The limitations were: "the claimant can understand, remember, and carry out simple instructions for simple, routine tasks; and can have occasional, superficial contact with the general public." *Id.* At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. AR 21. At step five, relying on the VE's testimony, the ALJ concluded that a significant number of jobs existed in the national economy that Plaintiff could perform. AR 22. As such, the ALJ concluded Plaintiff was "not disabled," as defined in the Social Security Act, from February 1, 2010, the alleged onset date, through June 30, 2012, the date of last insured. AR 23.

In challenging the ALJ's denial of benefits, Plaintiff argues the ALJ committed two reversible errors. First, Plaintiff argues that the decision lacked substantial evidence by misconstruing Dr. Lobatz' opinion and failing to explain Plaintiff's MRFC. Defendant responded by arguing, *inter alia*, that the ALJ's RFC assessment was proper, noting in particular, that "RFC is an administrative, not medical finding." ECF No. 12-1 at 4:1 (citing 20 C.F.R. § 404.1527(d)(2) and SSR 96-8p, 1996 WL 374184 (July 2, 1996) ("RFA is an administrative assessment"). Second, Plaintiff contends that the ALJ erred by improperly rejecting Plaintiff's subjective symptom testimony. ECF No. 11 at 8:23-25. Defendant responded by arguing that "the ALJ both identified Plaintiff's pertinent claims and explained why he partially discounted them." ECF No. 12-1 at 7:3-4. In reply, Plaintiff argued that (1) an unexplained MRFC must be reversed and (2) the ALJ failed to provide adequate reasons for discounting Plaintiff's subjective symptoms. ECF No. 13 at 1:20, 5:11-12.

### A.   The ALJ's RFC Assessment was Supported by Substantial Evidence

Plaintiff argues that the decision lacked substantial evidence by misconstruing Dr. Lobatz's opinion and failing to explain Plaintiff's MRFC. In advancing this argument, Plaintiff avers that the ALJ inverted Dr. Lobatz's opinion to reach a conclusion

1   unsubstantiated by the medical evidence. ECF No. 11 at 5:3-14. Plaintiff elaborates that

2   the ALJ implicitly rejected the opinion of the Agency's doctors at step two by listing

3   Plaintiff's mild neurocognitive disorder as "severe" because that listing as severe is

4   contrary to the Agency doctors' opinions, which found Plaintiff's impairments medically

5   determinable but not disabling. *See id.* at 3:18-24-4:1-10. Therefore, Plaintiff argues that

6   if the ALJ rejected the agency doctors, that leaves only Dr. Lobatz's determination that

7   Plaintiff is disabled as the sole medical opinion left upon which the ALJ could rely. *See*

8   *id.* at 3:21-23–4:1-10. Additionally, Plaintiff argues that "[t]he decision's MRFC rests on

9   impermissible sleight-of-hand" because it "cherry picks" from Dr. Lobatz's opinion to

10  conclude Plaintiff is not disabled. ECF No. 11 at 6-8. Plaintiff also argues that the ALJ's

11  more restrictive/more favorable assessment is not an unreviewable, harmless error because

12  the ALJ's significant work-related interactional limitation was not explained. *Id.* at 5.

### 1. *The ALJ's Step Two Decision Finding Severe Impairments was Proper*

15          The Court will first address the argument that Dr. Lobatz's opinion was the only

16  opinion left standing after step two. Again, step two requires the ALJ to "consider the

17  medical severity of" the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). The Court disagrees

18  that because the ALJ found Plaintiff had "severe impairments" at step two, he necessarily

19  must have wholesale rejected the agency doctor's opinions—because those doctors did not

20  deem Plaintiff disabled, and therefore, and only relied on Dr. Lobatz.

21          Step two of the disability determination process is a *threshold inquiry* meant to

22  screen out weak claims. *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017) (emphasis

23  added) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146–47 (1987)). A "finding that a

24  claimant['s disability] is severe at step two only raises a prima facie case of disability."

25  *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007). As the Supreme Court has

26  recognized, an overly stringent application of the severity requirement does not serve the

27  purposes of the Social Security Act. *Corrao v. Shalala*, 20 F.3d 943, 949 (9th Cir. 1994)

28  (citing to *Yuckert*, 482 U.S. at 156–58 (O'Connor, J. concurring)).

1    Despite the "gate keeper role" step two serves and the preference for a resolution of

2    the claimant's alleged disability, Plaintiff argues that the ALJ's threshold determination at

3    step two should limit the ALJ's use of the evidence at a further stage in the evaluation. *See*

4    ECF No. 11 at 3. Plaintiff's argument is unpersuasive.

5    First, step two serves to dispose of unsubstantiated claims, so attributing a complete

6    disposal of the Agency doctors' opinions during this initial inquiry is incorrect. *See*

7    *Hoopai*, 499 F.2d at 1076; *Luther v. Astrue*, 2010 U.S. Dist. LEXIS 91752 at *16 (E.D.

8    Cal. 2010) (describing step two "as a gatekeeping mechanism to dispose of groundless

9    claims"); *see also* SSR 96-3P, 1996 WL 374181, *2 (July 2, 1996) (requiring the step two

10   determination to ask whether the medically determinable impairments could be

11   "reasonably expected" to produce the symptoms). Second, even if "the adjudicator is

12   unable to determine clearly the effect of an impairment(s) on the individual's ability to do

13   basic work activities, the adjudicator must continue to follow the sequential evaluation

14   process until a determination or decision about disability can be reached." *Id.*

15   Additionally, it is not obvious whether the ALJ, in fact, implicitly and entirely disposed of

16   the Agency doctors' opinions as Plaintiff suggests, let alone at this preliminary stage in the

17   sequential evaluation. *Cf.* AR 21 ("The [ALJ] has considered but has not given great

18   weight to the determination of the State agency physical and mental medical consultants

19   [in determining the RFC]").

20              **2.    *The ALJ Did Not "Invert" Dr. Lobatz's Medical Opinion***

21   Plaintiff next argues the ALJ wrongly inverted Dr. Lobatz's opinion, or in lamen's

22   terms, turned the opinion upside down. ECF No. 11 at 6-8. For example, Plaintiff claims

23   the ALJ's decision "improperly detached" treating neurologist Dr. Lobatz's statement,

24   "[w]hen involving simple tasks, she is able to perform within normal limits," from its

25   proper context. ECF No. 11 at 6:3-4 (citing AR 339). According to Plaintiff, Dr. Lobatz's

26   more general disability conclusion, and not just the specific opinions supporting that

27   conclusion, should apply to the instant matter because the definitions are identical and his

28   opinion unambiguously finds a disability present. ECF No. 11 at 6-7. In sum, Plaintiff

1    argues the ALJ's decision was not supported by substantial evidence because the ALJ
2    undermined the opinion he used to conclude Plaintiff was, in fact, disabled. *See id.* at 8.

3          Defendant defends the ALJ's decision as supported by substantial evidence,
4    corroborated with specific and legitimate reasons that explain how the evidence was
5    weighed. ECF No. 12-1 at 3. First, Defendant contends that the ALJ gave sufficient weight
6    to the treating physician, Dr. Lobatz. *Id.* Second, Defendant defends the ALJ's synthesis
7    of Dr. Lobatz's medical opinion. *Id.* To this point, Defendant references Dr. Lobatz's
8    assessment of Plaintiff's abilities to understand, remember, carry out simple instructions,
9    interact appropriately with peers and supervisors, which were each listed as "not
10   significantly limited." *Id.* at 3–4 (citing to AR 337–38). Additionally, Defendant cites
11   Plaintiff's activities of daily living as consistent with the RFC delineated in the decision.
12   *Id.* at 4.

13         Defendant also argues that Dr. Lobatz's conclusion on the issue of disability is a
14   conclusion reserved for the ALJ. *Id.* at 5 (citing to *McLeod v. Astrue*, 640 F.3d 881, 885
15   (9th Cir. 2011) (discussing how "[a]n impairment is a purely medical condition," while
16   "[a] disability is an administrative determination of how an impairment, in relation to
17   education, age, technological, economic, and social factors, affects ability to engage in
18   gainful activity")). Specifically, Defendant argues that the ALJ appropriately discounted
19   Dr. Lobatz's ultimate conclusion, and instead, relied on Dr. Lobatz's specific assessment
20   of Plaintiff's functional capacity. *Id.*

21         "The law reserves the disability determination to the Commissioner." *McLeod*, 640
22   F.3d at 885. "A disability is an administrative determination of how an impairment, in
23   relation to education, age, technological, economic, and social factors, affects ability to
24   engage in gainful activity." *McLeod*, 640 F.3d at 885. "Although a treating physician's
25   opinion is generally afforded the greatest weight in disability cases, it is not binding on an
26   ALJ with respect to the existence of an impairment or the ultimate determination of
27   disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). As Plaintiff
28   correctly points out in her Motion, however, the ALJ may not "cherry-pick" evidence that

supports his conclusion while ignoring the totality of the medical evidence presented. *Torquato v. Berryhill*, 2018 U.S. Dist. LEXIS 104318 at \*22 (S.D. Cal. June 20, 2018) (Bashant, J.).

As a preliminary matter, it is important to revisit the basis for the ALJ's assessment of Plaintiff's RFC, particularly given the Court may only affirm the ALJ's decision based on the reasons set forth by the ALJ. *Molina*, 674 F.3d at 1121. Here, the ALJ's decision rendered the following RFC: "the claimant can understand, remember, and carry out simple instructions for simple, routine tasks; and can have occasional, superficial contact with the general public." AR 19. The ALJ cites to multiple examples to support the decision's RFC: (1) an unremarkable neurological exam after the Plaintiff's July 2009 car accident, AR 266-70, (2) progress notes from September 2009 that indicated mild word finding difficulty, AR 416-17, (3) a June 2010 neuropsychologist examination that showed impairment in the aspects of temporal orientation, sustained attention, phonemic oral word production, and confrontation naming inconsistencies, AR 351-60, (4) two neuropsychology appointments in November 2010 and March 2011 that noted anxiety with restricted affect and disorganization with memory difficulties, AR 347, and (5) two separate opinions from Dr. Lobatz, AR 336-39 (June 2, 2015), 361-65 (July 22, 2015). AR 20.

The ALJ gave significant weight to Dr. Lobatz's opinion. *Id.* The relevant portion of the ALJ's decision follows as such,

> Dr. Lobatz's opinion regarding the claimant's functional limitations is highly regarded because it is well-supported by the objective medical evidence and it is consistent with the record a whole, including the claimant's activities of daily living.[9] Although the final responsibility for determining the issue of disability is reserved to the Commissioner, this opinion of the treating physician is well-supported by clinical and diagnostic

---

[9]    According to Dr. Lobatz, the Plaintiff is "able to perform all of her normal basic activities of daily living, including bathing, dressing and grooming, driving, meal preparation and other things." AR 324.

> findings and is not inconsistent with the other substantial
> evidence of record. The doctor indicated that the claimant can
> perform simple tasks. That opinion is consistent with the
> assessed [RFC].

*Id.* The ALJ then explains why he did not give great weight to the opinions of the Agency's doctors, before concluding that the RFC is supported by the evidence as a whole. AR 21. Because the ALJ relied on Dr. Lobatz's medical opinion, it is important to review this material.

The first opinion from Dr. Lobatz that the ALJ relied on was Dr. Lobatz's June 2, 2015 Mental Residual Functional Capacity Assessment regarding Plaintiff's ability to pay back her student loans. AR 20. This assessment required Dr. Lobatz to determine whether Plaintiff could engage in substantial gainful activity, defined similarly to the definition set forth in the Social Security Regulations. *Compare* AR 336 (defining "substantial gainful activity" as "a level of work performed for pay or profit that involves doing significant physical or mental activities, or a combination of both") *with* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" as work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit"). Dr. Lobatz determined there was a medically determinable impairment stemming from "traumatic brain injury [and] cognitive deficits." AR 336. The severity of the impairments was described as "significant difficulty with multi-tasking, word-finding, recall and impaired memory." *Id.*

When prompted to list the Plaintiff's limitations, Dr. Lobatz found Plaintiff had: (1) "no significant limitation" in regard to sitting, standing, walking, or lifting; (2) "difficulty with remembering tasks and chores, writing, speaking" in regard to activities of daily living; (3) "difficulty with concentration, cognitive tasks, [] memory deficits" in regard to residual functionality; and (4) social/behavioral limitation "correlated with her concentration/cognitive/memory deficits." AR 336.

When prompted to determine the extent of Plaintiff's limitations in the category of "understanding and memory," Dr. Lobatz found Plaintiff was "moderately limited" in "the

-22-

ability to understand and remember detailed instructions." AR 337. However, in both "the ability to remember locations and work-like procedures" and "the ability to understand and remember very short and simple instructions," Dr. Lobatz concluded that Plaintiff was "not significantly limited." AR 337.

When prompted to determine the extent of Plaintiff's limitations in the category of "sustained concentration and persistence," Dr. Lobatz found Plaintiff was "moderately limited" in: "the ability to maintain attention and concentration for extended periods;" "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." AR 337–38. However, Dr. Lobatz found Plaintiff was "not significantly limited" in the following: "the ability to sustain an ordinary routine without special supervision;" "the ability to work in coordination with or proximity to others without being distracted by them;" and "the ability to make simple work-related decisions."[10] *Id.*

Dr. Lobatz concluded his assessment with the following:

> The Patient appears to have some difficulty with memory and concentration. When involving simple tasks, she is able to perform within normal limits. However, based on neuropsych [sic] testing, her memory and concentration deficits were seen with more complex tasks and delayed recall. She also appears to have difficulty with sustained attention as well as difficulty with comprehension of orally presented information. Due to her difficulties, she relies heavily on an employee to help complete tasks for her business and she even had to close two stores and reduce to only her home-based business.

AR 339. The second opinion from Dr. Lobatz that the ALJ relied on was a supplemental report to Plaintiff's lawyer. AR 20; 361–65. In relevant part, this report reads:

---

[10]   Dr. Lobatz also assessed Plaintiff's abilities in the categories of "social interaction" and "adaption." AR 338. For each subcategory within these two aforementioned categories, Dr. Lobatz concluded Plaintiff was "not significantly limited." *Id.*

-23-

> Neuropsychological testing done by Dr. Kabat suggests the possibility of a mixed picture of preexisting neuropsychological dysfunction as well as acquired abnormalities and the patient did have some pre-injury neuropsychological testing that did not demonstrate any significant learning disabilities or problems as compared to abnormalities seen by the most recent testing and appear to correlate with the patient's impressions of a significant change that has occurred following the most recent injury.

AR 364.

Plaintiff wrongly argues that the ALJ "inverted" Dr. Lobatz's opinion. For Plaintiff's argument to hold water, there would need to be contradictory evidence in the record that opposes the ALJ's determination that Plaintiff was not under a disability under the framework of the Medical-Vocational Guidelines.[11]   *See* AR 22-23.   Attempting to show such contrary evidence, Plaintiff cites to Dr. Lobatz's statement that Plaintiff has difficulty comprehending orally presented information and required assistance from an employee to help with her home business. ECF No. 11 at 7. However, this evidence is not inconsistent with the ALJ's RFC. The ALJ concluded "the claimant can understand, remember, and carry out simple instructions for simple, routine tasks." AR 20. This assessment does not contradict Dr. Lobatz's medical opinion that Plaintiff was "moderately limited" in "the ability to understand and remember detailed instructions" but "not significantly limited" in the ability to understand and remember very short and simple instructions." AR 337. As such, Plaintiff's real issue is not that the ALJ was "picking and choosing" evidence, but that the ALJ did not ultimately adopt Dr. Lobatz's conclusion on disability.[12]

---

[11]    As discussed below, the possible inconsistency in the ALJ's RFC is a more favorable work-related social interaction limitation. *See infra* pp.19–21.

[12]    Thus, the cases that Plaintiff cites do not help her position. *See e.g., Denton v. Astrue*, 569 F.3d 419, 425 (7th Cir. 2010) (analyzing whether the ALJ in fact "cherry-picked" information where the ALJ did not assign significant weight to potentially contradicting evidence); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (requiring the ALJ to explain the reasons for rejecting the treating physician's determination of medical

-24-

1     As stated, it is well established that the ultimate decision of disability is reserved for

2 the ALJ. *McLeod*, 640 F.3d at 884–85; 20 C.F.R. § 404.1527(d)(1).  An impairment is

3 purely a medical condition; a disability is an administrative determination. *McLeod*, 640

4 F.3d at 884–85.  Here, Dr. Lobatz determined there were medical impairments, and the

5 ALJ followed Dr. Lobatz's medical opinion regarding these impairments.  AR 19–21.

6 However, the ALJ diverged from Dr. Lobatz's conclusion as to the ultimate issue of

7 whether Plaintiff was disabled, *id*, which was appropriate given the law reserves such a

8 determination for the ALJ, 20 C.F.R. § 404.1527(d)(1).  Because the ALJ's determination

9 is supported by substantial evidence, the Court cannot sustain Plaintiff's Motion on this

10 basis.[13] *See Molina*, 674 F.3d at 1110.

11         **3.**     ***The ALJ's More Favorable Social Interaction Limitation is Not a***

12         ***Harmful Error***

13     The ALJ concluded that "[i]n interacting with others, the claimant had a moderate

14 limitation," AR 18, and could "have occasional, superficial contact with the general

15 public," AR 19.  Plaintiff argues that "[t]he decision should be reversed for utterly failing

16 to explain its interactional limitations." ECF No. 11 at 5:14-16.  Plaintiff argues that

17 because "the decision ***did*** find significant work-related interactional limitations, this Court

18 cannot consider the decision's utterly unreviewable error harmless." *Id.* at 5:20-11.

19 Plaintiff also argues the ALJ's more favorable work-related social limitation is not a

20 harmless error because it is not explained in the decision. ECF No. 11 at 5:15-18 (arguing

21 that "[n]ot a word is said there about work-related social interactions").  Defendant

22 responds by noting that even though Plaintiff takes issue with the ALJ's RFC, it is unclear

23 why seeing as the ALJ's decision that Plaintiff had a moderate limitation in her ability to

24 interact with others was, in fact, more favorable than that of Plaintiff's own treating

26 impairments); *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (same).

27 [13]    At worst, the evidence is subject to multiple interpretations.  If, *arguendo*, the

28 evidence is, in fact, open to multiple interpretations, the Court is still required to affirm the ALJ's conclusions where substantiated by the evidence. *Molina*, 674 F.3d at 1111.

1   physician, Dr. Lobatz, who concluded that "the claimant had a mild cognitive disorder and

2   was able to perform simply tasks within normal limits" and "had no limitations in social

3   functioning." ECF No. 12-1 at 6:1-2 (citing AR 20, 338).

4          It is true that the ALJ does not explicitly state his reasons for the work-related social

5   limitation. *See* AR 19–21. However, Plaintiff wrongly asserts that the more favorable

6   restriction constitutes a harmful and reversible error. An error is harmless where "it is

7   inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115.

8   (quoting *Carmickle*, 533 F.3d at 1162). In assessing whether the error is harmless, the

9   court looks to the record as a whole to determine whether the error alters the outcome of

10   the case. *Id.* Generally, if the ALJ assesses a more restrictive RFC, even if the ALJ erred

11   in the assessment, the error is harmless because the additional restriction is more favorable

12   to the plaintiff. *See Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (applying the

13   harmless error doctrine where the mistake was non-prejudicial to the claimant); *Torres v.*

14   *Berryhill*, 2018 U.S. Dist. LEXIS 124710 at *10 (S.D. Cal. July 25, 2018) (Huff, J.)

15   (applying *Stout*). Although the burden of showing that the error was not harmless rests

16   with the party attacking the agency's determination, the reviewing court can decide

17   whether further administrative review is necessary to determine whether there was

18   prejudice from the error. *McLeod*, 640 F.3d at 888 (quoting *Shineski v. Sanders*, 556 U.S.

19   396, 409–10 (2009)). Critically, "where harmlessness is clear and not a 'borderline

20   question,'" remand for reconsideration is not appropriate. *Id.*

21          Here, the ALJ did not render a disabling RFC for Plaintiff despite imposing a strict

22   limitation on the Plaintiff's work-related social interactions. It is difficult to see how this

23   stricter limitation constitutes a consequential or prejudicial error to Plaintiff. Even

24   assuming the ALJ erred in giving Plaintiff a stricter limitation than her own physician, the

25   ALJ's more restrictive RFC reduced the amount of potential jobs available in the domestic

26   economy that Plaintiff could perform. Such a reduction makes it more—not less likely—

27   that Plaintiff would be disabled. Because the error rendered Plaintiff more likely to be

28   disabled and the ALJ still did not render a favorable disability finding, the error proved

-26-

1    "inconsequential to the ultimate nondisability determination." *See Molina*, 674 F.3d at

2    1115. The reviewing court need not make an independent finding based on the evidence

3    to conclude this error was harmless. *See Brown-Hunter*, 806 F.3d at 492. For the foregoing

4    reasons, Plaintiff does not establish a reversible error on this point.

5           In sum, the Court concludes that substantial evidence supports the ALJ's

6    determination. Therefore, the Court denies Plaintiff's Motion on these grounds and grants

7    Defendant's Cross-Motion.

8           **B.    The ALJ Did Not Improperly Reject Plaintiff's Subjective Allegations**

9           Plaintiff next argues that the ALJ wrongly rejected Plaintiff's subjective symptom

10   testimony. ECF No. 11 at 8-10. Defendant argues that "the ALJ both identified Plaintiff's

11   pertinent claims and explained why he partially discounted them." ECF No. 12-1 at 8:4-5.

12   In her Reply Brief, Plaintiff responds that Defendant's argument tries to draw a distinction

13   between lacking support from medical evidence and contradicting medical evidence, and

14   a plaintiff's testimony may only be rejected where medical evidence contradicts with the

15   claimant's testimony. ECF No. 13 at 6:6-7, 15-18, 7:1-6. As a result, Plaintiff argues that

16   "[b]ecause the decision found Ms. Kelley's allegations 'could reasonably be expected'

17   from her 'medically determinable' (supported by objective medical evidence) impairments

18   . . . and merely were 'not entirely consistent with it'," ECF No. 13 at 6:15-18, Plaintiff's

19   testimony should have been accepted because lacking support does not equate to

20   conflicting with medical evidence.

21          To determine whether Plaintiff's subjective symptom testimony regarding pain or

22   symptoms is credible, an ALJ engages in a two-step analysis. This analysis requires the

23   ALJ to examine the entire record, including the plaintiff's subjective symptoms. SSR 16-

24   3P, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. § 1529(c)(1)-(4). First, the ALJ

25   "determine[s] whether the individual has a medically determinable impairment that could

26   reasonably be expected to produce the individual's alleged symptoms." SSR 16-3P; 20

27   C.F.R. § 404.1529(b). Second, once an underlying impairment can be expected to produce

28   the plaintiff's symptoms, the ALJ must evaluate the intensity, persistence, and limiting

-27-

1  effects of the claimant's symptoms to determine the extent to which they limit the

2  claimant's functional limitations.  SSR 16-3p; 20 C.F.R. § 1529(c)(1).

3        Where the ALJ determines the plaintiff is not malingering[14] and has produced

4  objective medical evidence of an underlying impairment, the ALJ must provide "specific,

5  clear and convincing reasons" for rejecting the plaintiff's subjective testimony regarding

6  the severity of the symptoms.  *Treichler v. Comm'r of SSA*, 775 F.3d 1090, 1102 (9th Cir.

7  2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  "General findings

8  are insufficient."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  The "clear and

9  convincing" standard requires the ALJ to "state specifically which symptom testimony is

10  not credible and what facts in the record lead to that conclusion."  *Smolen*, 80 F.3d at 1284.

11  The ALJ's decision must explain its reasoning to ensure meaningful appellate review.

12  *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 2002).

13        Here, Plaintiff primarily argues that the ALJ rejected her symptom allegations by

14  finding them mild.  During the hearing before the ALJ, Plaintiff testified that she (1) had

15  trouble counting (for example, having to ask her husband what number she was on when

16  she got to five), AR 49-50, (2) suffered from memory problems (for example, forgetting

17  what step she is on of her morning coffee-making process if she gets interrupted), AR 50,

18  and (3) had trouble sorting checks by numbers, AR 50-51.

19        At step one, requiring determination of whether the individual has a medically

20  determinable impairment that could reasonably be expected to produce the alleged

21  symptoms, the ALJ identified memory and concentration difficulties, poor short-term

22  memory, and anxiety as Plaintiff's symptom allegations.  AR 19.  The ALJ determined (1)

23  Plaintiff was not malingering, and (2) "the claimant's medically determinable impairments

---

25  [14]    Malingering has been "defined in the DSM-IV as the 'intentional production of false

26  or grossly exaggerated physical or psychological symptoms, motivated by external
    incentives such as avoiding military duty, avoiding work, obtaining financial

27  compensation, evading criminal prosecution, or obtaining drugs.'"  *United States v.*

28  *Wilbourn,* 336 F.3d 558, 559 (7th Cir.2003) (citing American Psychiatric Association,
    Diagnostic and Statistical Manual of Mental Disorders 739 (rev. 4th ed.2000)).

could reasonably be expected to cause the alleged symptoms," *See* AR 19–21. As a result, the ALJ proceeded to step two, which requires evaluation of "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." SSR 16-3p; 20 C.F.R. § 1529(c)(1). In undertaking his step two evaluation, the ALJ determined that Plaintiff's "statements about the intensity, persistence, and limiting effects of . . . her symptoms . . . are inconsistent because the medical evidence of record regarding the claimant's cognitive disorder shows conservative treatment and mild findings." AR 20. The ALJ explained his reasons for discounting Plaintiff's testimony as follows:

> Despite the claimant's subjective complaints, however, the medical evidence of record reveals mild medical findings. Neurological examinations found only mild word finding difficulty. Testing showed some difficulty with memory and concentration. The claimant's treating physician opined that the claimant had a mild cognitive disorder and was able to perform simple tasks within normal limits. Accordingly, the undersigned finds that the objective evidence regarding the claimant's cognitive disorder was mild and supports the [RFC].

*Id.* The decision then summarizes the medical evidence in support of the RFC. *Id.*

The Court finds the ALJ's decision here supported by sufficient reasoning. The ALJ identified Plaintiff's issues with memory and concentration. Then, the ALJ provided reasons for why he did not fully credit her subjective testimony (e.g., a history of conservative treatment and mild findings).

To support the mild findings, the ALJ explained that Plaintiff's testing showed mild word-finding difficulty, some difficulty with memory and concentration, and her treating physician opined that she had a mild cognitive disorder and was able to perform simple tasks within normal limits. Specifically, the ALJ referenced Dr. Chyung's September 2, 2009 examination, well before Plaintiff's alleged onset date albeit after her car accident, where claimant also reported issues with memory and "mild word finding difficulty"; however, those issues were assessed to be mild and "the examination was otherwise

unremarkable." AR 20 (referring to AR 413-415). If, in 2009, Plaintiff had the same allegedly disabling conditions and was able to work, then, similar conditions arising after the date of disability should not make her unable to work after the alleged onset date. The ALJ also referenced Dr. Lobatz's opinion as consistent with finding that Plaintiff could perform simple tasks within normal limits. AR 20 (citing to Plaintiff's MRFC Assessment, AR 337, which showed Plaintiff's "ability to make simple work-related decisions" was "[n]ot [s]ignificantly [l]imited"). To support the conservative treatment finding, the ALJ pointed out that the treatment Plaintiff received after her car accident, including the neurological examination (July 22, 2009) and CT (July 11, 2009), was unremarkable and did not show significant evidence of injury. AR 20 (citing to AR 420). In addition, the ALJ referenced Plaintiff's March 18, 2011 appointment with Joanna T. Savarese, Ph.D., during which Plaintiff "reported that she has slightly improved her organizational skills." AR 20 (referring to the March 2011 appointment documented on AR 347).

Plaintiff also argues that the ALJ committed a harmful error by omitting to analyze the severity of her alleged anxiety during step two of the of the RFC assessment. ECF No. 11 at 9:1-6. Defendant responds that "the ALJ . . . identified Plaintiff's reported symptoms of anxiety," ECF No. 12-1 at 9:15-16 (citing to AR 19, in which the ALJ stated that "claimant reported symptoms of anxiety"), but does not disagree that the ALJ does not specifically discuss the severity of anxiety, ECF No. 12-1 at 9. Defendant argues that the failure to discuss the severity of the anxiety does not constitute reversible error as the ALJ need only discuss evidence that is significantly probative. *See id.* at 9 (citing to *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003)). Defendant also cites to evidence in the record of Plaintiff denying a history of significant clinical anxiety. *Id.* at 9:21-23 (citing to AR 353, 332, in which Plaintiff denied a history of significant anxiety).

The ALJ need not discuss every piece of evidence in the record. *Howard*, 341 F.3d at 1012. "Rather, the ALJ must explain why significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) (citation omitted); *see also Parker v. Barnhart*, 67 F. App'x 495, 497 (9th Cir. 2003) (considering a doctor's

-30-

statement as not significantly probative because the statement was speculative); *Houghton v. Comm'r SSA*, 493 F. App'x 843, 845–46 (9th Cir. 2013) (considering the claimant's failure to show significantly probative evidence as failing to trigger the ALJ's duty to specifically explain which symptoms he discounted); *cf. York-Spann v. Astrue*, 400 F. App'x 207, 208 (9th Cir. 2010) (considering the ALJ's failure to reference claimant's bipolar disorder as a harmful error because the symptom was substantiated by the medical record). Further, the ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Montgomery v. Chater*, 69 F.3d 273, 275 (8th Cir. 1995). Here, Plaintiff fails to demonstrate her anxiety is significant probative evidence.[15] As such, the Court does not find this omission as indicative of a harmful error.

Plaintiff plainly disagrees with the ALJ's final determination and attributes that to the ALJ ignoring her symptom testimony. However, the Court finds that the ALJ did discuss the issues with memory and concentration that Plaintiff complained about to not only the ALJ, but also to many of her doctors. The ALJ gave sufficient reasons for supporting his finding that the difficulties were mild. Accordingly, the Court denies Plaintiff's motion for summary judgment on these grounds and grants Defendant's motion.

## V.   CONCLUSION

The Court finds that the ALJ's decision to deny Plaintiff's benefits as supported by substantial evidence. Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgment. The administrative law judge's decision is **AFFIRMED**. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff, and to close the docket pursuant to 28 U.S.C. § 636(b)(b)(4)(c)(1).

**IT IS SO ORDERED.**
DATED: September 22, 2020

_____
**HON. ROGER T. BENITEZ**
United States District Judge

---

[15]   Plaintiff's only argument to this point is that "according to common sense, [anxiety] would interact with" her principal impairment. ECF No. 11 at 9:4-6.